UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

NANCY ERNEST,
    Plaintiff,

v.                                    C.A. No. 20-477-JJM-PAS

THE UNITED STATES OF AMERICA,
    Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

### I. INTRODUCTION

Nancy Ernest brings this claim against the United States under the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671-2680. A truck driven by an employee of the United States Post Office struck the back of a car Ms. Ernest was driving on April 2, 2019. She suffered personal and economic injuries. The case was tried before the Court sitting without a jury. The disagreement between the parties is the extent of Ms. Ernest's injuries, and particularly, whether the car collision was a substantial contributing factor in Ms. Ernest's hip replacement two years later. The Government suggests that a total award of $45,000–$55,000 would be reasonable compensation for her personal injuries, and Ms. Ernest asserts that $300,000 is reasonable compensation.

### II. PROCEDURAL BACKGROUND

Ms. Ernest filed a timely claim with the United States Postal Service per 28 U.S.C. § 2401 for her damages sustained in the collision. The Postal Service did not

act in response to Ms. Ernest's claim. Ms. Ernest later filed a lawsuit against the United States under the Federal Torts Claims Act for her injuries.

After discovery, the Court scheduled a bench trial per 28 U.S.C. § 2402. The Court heard the live testimony of Ms. Ernest and her husband Michael, a police officer in Norwich, Connecticut. The Court granted leave for counsel to present the deposition testimonies, in lieu of live testimony, of Scott J. Stanat, M.D., testifying on behalf of Ms. Ernest, and Orrin H. Sherman, M.D., testifying on behalf of the Government. Both parties have given the Court the deposition transcripts. The Court has reviewed all the medical records and exhibits and read and studied the trial testimony via depositions. Under Fed. R. Civ. P. 52, the Court issues these Findings of Fact by a preponderance of the evidence, and Conclusions of Law.

### III. FINDINGS OF FACT

1. The Plaintiff, Nancy Ernest of Sterling, Connecticut, was driving on Victory Highway in North Smithfield, Rhode Island on April 2, 2019.

2. Ms. Ernest's drive was interrupted as her 2008 Nissan Ultima was struck from behind ("collision") by a 26-foot Ryder box truck, driven by Hugo Toll, an on-duty employee of the United States Postal Service delivering U.S. mail.

3. At the time of the collision, Ms. Ernest was 62 years old, about 5 feet 4 inches tall, and weighed about 186 pounds.

4. The collision caused severe damage to Ms. Ernest's car—her vehicle was a total loss.

5. Both parties agree that the negligence of Mr. Toll caused the collision that injured Ms. Ernest.

6. Both parties agree that the damage to Ms. Ernest's vehicle was $5,450, with added towing and storage fees of $720, for a total property damage loss of $6,170.

7. The collision jolted Ms. Ernest forward in her seat, leading to her first complaining of neck and lower back pain. Immediately following impact, Ms. Ernest experienced numbness and her neck was sore. She began experiencing pain in her lower back.

8. After the collision, Ms. Ernest was able to step out of the vehicle and move around freely.

9. Emergency personnel placed Ms. Ernest on a stretcher and transported her to Landmark Medical Center Emergency Department.

10. By the time Ms. Ernest had arrived at the Emergency Department, she told the medical personnel that her lower back pain had increased. Ms. Ernest reported pain levels of 5 out of 10 to the neck and 6 out of 10 to the lower back.

11. Emergency Department personnel examined Ms. Ernest. Ms. Ernest reported neck and back pain; she was able to ambulate; denied any radiation of the pain, any weakness, and any numbness; and was not in acute distress. The Emergency Department personnel concluded that x-rays were unnecessary and prescribed pain medication—Flexeril and Diclofenac. Ms. Ernest was diagnosed with a low back strain and released. There is no reference in the medical records of any issue with Ms. Ernest's hips.

12. Ms. Ernest had a history of chronic neck and back pain before the accident, dating to at least 2013. Her preexisting history included chronic pain in both her neck and back pain, as well as preexisting arthritis, diverticulitis, hypertension, and anxiety. Ms. Ernest also had several surgeries before the accident—knee surgery, rotator cuff repair, carpal tunnel release on both hands, bladder suspension, sigmoid colectomy with a colostomy, and a fractured tibia.

13. The Emergency Department personnel recommended Ms. Ernest seek treatment with her physician, which Ms. Ernest sought two months after the collision.

14. Because of the collision, Ms. Ernest could not work at St. Antoine's Community in North Smithfield, Rhode Island where she was employed as a bookkeeper.

15. Ms. Ernest visited her primary medical caregiver, Stephanie Pollard, a nurse practitioner. Ms. Ernest told Ms. Pollard that her lower back was continuing to bother her and getting worse. Ms. Pollard referred her to an orthopedic doctor at Orthopedic Partners in North Franklin, Connecticut.

16. Gabriel Abella, M.D., the orthopedic doctor specializing in physical medicine and rehabilitation recommended to Ms. Ernest, prescribed a course of physical therapy and regular steroid injections.

17. Ms. Ernest later began treatment with Dr. Ammar Anbari, of Orthopedic Partners. He describes her pain, including pain in her "low back into the left posterior hip." Dr. Anbari says that Ms. Ernest's "injury is consistent with her

4

symptoms of pain and the mechanism of injury is all consistent with [the collision]. She had no history of issues or problems with the hip prior to that. *** Within a reasonable degree of medical probability, the pain in both of the hips is related to the motor vehicle collision that the patient was involved in on 4/2/2019."[1]

18.  About a year after the collision, Dr. Anbari referred Ms. Ernest to Dr. Scott J. Stanat[2], an orthopedic surgeon specializing in joint replacements. In the referral note, he said: "Nancy is a very pleasant 63-year-old female who I had a telemedicine visit with today. She has been having pain in both of her hips since she was involved in a motor vehicle accident. Dr. Anbari had seen her, ordered the MRI of her hips, read the MRI which demonstrates significant degenerative change on the left with labral tearing which is much worse than the degenerative joint disease."

19.  Dr. Stanat performed hip replacement surgery on Ms. Ernest in September 2020, about a year and a half after the collision.

20.  Dr. Stanat testified to a reasonable degree of medical certainty that the collision was a substantial aggregating factor for the cause of Ms. Ernest's hip degeneration and need for a hip replacement. He explained his opinion:

> My opinion was based on all the information that was available to me, including the medical record, information from the patient herself and the course of treatment. According to our medical record and review, she had no prior symptoms to the hip prior to the above injury date. I was unaware of any additional outside treatment to that hip prior to

---

[1] The Government objects to the admissibility of this statement. The Court's ruling on that will follow in the Conclusions of Law section.

[2] The parties stipulate that Ms. Ernest's expert and treating surgeon Dr. Scott J. Stanat as well as the Government's expert Dr. Orrin H. Sherman are qualified as experts in the field of orthopedic surgery under Federal Rules of Evidence 702 and 703.

that and the examination and imaging that I performed in 2013 did not demonstrate any pre-existing arthritis or degeneration at that point, and in the ensuing 16 months from the injury, she had progressive decline of the hip joint with progressive degeneration to that point which I had seen her on 8/20/2020.

\*\*\*\*\*\*\*\*\*\*

Based on the data that I had from her medical record, imaging, her complaints and her history I believe that my statement is correct. She had a well functioning hip with no pain. She rapidly deteriorated 17 months after a motor vehicle collision and it required further treatment and aggravating lifestyle factors that required operative intervention. Prior to this she had seen me for multiple years with no complaints to this joint. She did not have any prior limitation prior to the accident. In addition, she had confounding exacerbating factors from her lumbar spine that further caused this to occur. From the data that I see in front of me, most hips do not rapidly deteriorate under two years which she had prior documented imaging of no pre-existing degenerative defect, no prior degenerative joint disease, no other reason to have a rapid degeneration of her hip.

\*\*\*\*\*\*\*\*\*\*

Separately, I do believe that her motor vehicle collision had caused the need for a total hip arthroplasty as she was doing well without any significant complaints before the collision and had no other significant limitations prior to such and then after such had required symptomatology to require her to need total hip arthroplasty surgery.

21.  Ms. Ernest did not have problems with her left hip before the collision. Ms. Ernest had no preexisting issues or complaints of pain in her left hip at any time before the collision.

22.  While Ms. Ernest had underlying exacerbating factors that also contributed to her need for hip replacement surgery, the injuries caused by the collision were a substantial contributing factor in the need for her hip surgery.

23. Dr. Sherman, the Government's expert, reviewed all the records, but never examined Ms. Ernest. Dr. Sherman opinioned to a reasonable degree of medical certainty, Ms. Ernest's left total hip replacement and any degeneration to her right hip were not causally related to the collision.

24. Following her discharge, Ms. Ernest needed the use of a walker for three months. She was out of work for two and a half months and engaged in frequent physical therapy.

25. Both parties have stipulated that if the Court finds the left hip replacement is causally connected to the April 2, 2019, motor vehicle collision, there is an added $12,372.10 owed in lost wages.

26. After the surgery, complications arose. Two weeks post operative, Ms. Ernest developed cellulitis around the incision and an aspiration of the subcutaneous tissue was needed. She required a further aspiration a month later. Ms. Ernest described the aspirations as painful, and the infection as having left her tired. Both Dr. Stanat and Dr. Sherman confirmed that cellulitis is a painful condition.

27. The Court finds that Ms. Ernest's expert, Dr. Stanat's opinion is highly credible for a myriad of reasons, including:

    a. He treated Ms. Ernest and personally examined her and performed her surgery. An expert's opinion that treated a patient is more credible, all things being equal, than a hired expert who only conducted a records review.

    b. Dr. Stanat is an adult reconstruction specialist who treats mostly hip and knee pathology. Dr. Sherman, the Government's expert, is an expert hip and knee surgeon but, "the vast majority of that had to do with knees."[3]

    c. Dr. Stanat's opinion was consistent with Ms. Ernest's referring treating orthopedic, Dr. Anbari.

    d. Ms. Ernest had a "well-functioning hip with no pain. She rapidly deteriorated 17 months after [the collision], and it required treatment and aggravating lifestyle factors that required operative intervention." Prior to the hip problem, Ms. Ernest had seen Dr. Stanat with "no complaints to this joint [and] she did not have any prior limitation prior to the accident." Also, "most hips do not rapidly deteriorate under two years," and she had had prior imaging showing no preexisting degenerative defect, no prior degenerative joint disease, and no other reason to have rapid degeneration of her hip."

## FINDINGS OF LAW

28.    Dr. Anbari's and Dr. Stanat statements fall within the exception to the rule against hearsay in Fed. R. Evid. 803(4) ("Statement Made for Medical Diagnosis

---

[3] In assessing credibility, the Court wonders why the Government would turn to a doctor in New York whose greater experience is with knees and not hips, who never examined Ms. Ernest, who charges $750 per hour for his review and testimony, and whose decisions when determining football players' disabilities, "more often than not is to say that these individuals are not disabled." It is one of the reasons why the Court does not find his testimony and conclusions persuasive.

8

or Treatment"). Ms. Ernest sought treatment with Dr. Anbari and Dr. Stanat for purposes of medical treatment. The statements contained in the doctors' reports are pertinent to that purpose. As noted by Rule 803(4)(B) an exception to the hearsay rule is a statement describing "medical history; past or present symptoms or sensations; their inception; *or their general cause.*" (emphasis added). Statements as to causation made by the doctors were not made at the request of or "supplied by an attorney involved in litigating a case involving the condition or injury" but were made by the doctors during their treatment of Ms. Ernest for purposes of medical diagnosis, treatment, and causation. Thus, the entirety of the doctors' reports is admissible, and the Court will consider them. The Court overrules the Government's objection to the statements.

29. While Ms. Ernest had underlying exacerbating factors that also contributed to her need for surgery, the injuries caused by the collision were a substantial factor as to the need for her surgery. The collision need not be the sole cause of the hip replacement, if it was a substantial factor, which the Court so finds. *Claiborne v. Duff*, No. PC 10-6330, 2015 WL 3936909, at *11 (R.I. Super. June 23, 2015) ("While [it] may not have been the sole cause of [the injury], [if it] was a contributing cause of [her] problems. The weight of this testimony must be left to the fact-finder.")

30. That Ms. Ernest had a certain physical condition before the accident, was 62 years old or in a fragile state, does not excuse the Government from its responsibility for the damages caused to her. *Mangasarian v. Gould*, 537 A.2d 403,

407 (R.I. 1988) ("The law is well-settled in this jurisdiction that in a personal-injury action, the defendants take their victims as they find them.") (citing, *Lebon v. B.L.& M. Bottling Co.*, 339 A.2d 272 (R.I. 1975)).

31. Ms. Ernest has met her burden by a preponderance of the evidence to prove that as a proximate result of the negligence of an agent of the United States acting within the scope of his employment, Ms. Ernest was injured and suffered severe damages.

32. Ms. Ernest has met her burden by a preponderance of the evidence to prove a causal connection between the collision and her hip replacement on September 16, 2020.

33. Ms. Ernest has met her burden by a preponderance of the evidence to prove all necessary elements of her claim and of her damages as alleged.

## **DAMAGES**

| | |
|---|---|
| A. Plaintiff's property damage (stipulated to): | $6170.00 |
| B. Lost Wages (stipulated to): | $12,580.10 |
| C. Medical Expenses: | $59,354.41 |
| D. Pain and Suffering: | $300,000.00 |

Thus, the Court awards damages of $306,170.00[4], plus costs, and post judgment interest as allowed by statute. Judgment will enter for the Plaintiff.

---

[4] Because Ms. Ernest's Statement of Claim was for $300,000 for personal injury, the Court limits its judgment to the $300,000, plus $6170 for property damage.

IT IS SO ORDERED

_____

John J. McConnell, Jr.
Chief Judge
United States District Court

September 6, 2023